UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:21-cv-2592

FITNESS TOGETHER FRANCHISE, LLC,

       Plaintiff,

v.

NATHAN PARTRIDGE; and
COURTNEY CRONIN,

       Defendants.

---

**PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

---

Plaintiff Fitness Together Franchise, LLC ("FTF") submits this Motion for Temporary Restraining Order and Preliminary Injunction against Nathan Partridge and Courtney Cronin (jointly, "Defendants") pursuant to F.R.C.P. 65 and D.C.Colo.L.CivR 65.1(a).[1]

## <u>CERTIFICATE OF CONFERRAL – D.C.COLO.L.CIVR 7.1(a)</u>

FTF's counsel certifies that she has attempted to notify and confer with Defendants regarding this Motion but she has received no response. On September 21 and 22, 2021, counsel sent Defendants conferral correspondence (**Exs. 1-2**), wherein FTF advised that it would be seeking injunctive relief. Defendants also sent via overnight mail the September 21 letter to Defendants' last known addresses. Defendants have not responded. FTF is also providing

---

[1] To comply with all applicable rules, FTF is simultaneously requesting a temporary restraining order and preliminary injunction. The first request is proper and needed, given the urgent nature of this matter, immediate harm FTF faces (as set forth below), and the fact that FTF has attempted to confer with, and notify, Defendants but has received no response. Indeed, F.R.C.P. 65 and D.C.Colo.L.CivR 65.1, permit the issuance of a temporary restraining order before, and in addition to, a preliminary injunction to last the pendency of the case. If this Court denies FTF's request for a temporary restraining order, FTF requests that this Court consider FTF's simultaneous request for a preliminary injunction, including by holding an expedited hearing as the Court's calendar allows.

Defendants copies of all filings in the action by email and overnight carrier. Counsel will likewise send to Defendants copies of any orders this Court issues. FTF has thus fulfilled the requirements of Rule 65(b) and D.C.Colo.L.CivR 65.1 to proceed *ex parte*, if necessary.

## INTRODUCTION

FTF, a personal training fitness franchise with approximately 117 studio franchisees nationwide ("Studios"), seeks injunctive relief against its former franchisee's owners and guarantors (Defendants), whose FTF franchises were previously terminated and who are now unlawfully competing against FTF from an FTF franchise location using FTF's trade secrets in violation of their contractual obligations and state and federal law.

Partridge, through his entities, Everest Fitness Inc. and Everest Wellness Inc. (together, "Everest"), operated two FTF Studios under FTF franchise agreements until June 9, 2021, when FTF terminated them. Partridge guaranteed both franchise agreements, with Cronin guaranteeing one of them and, as Partridge's spouse, being bound by certain provisions in both. While in operation, Defendants benefited from FTF's unique brand and goodwill, gaining the right to access and use FTF's trademarks, fitness and nutrition methods, and confidential and trade secret information, including FTF's confidential client data. To protect such information and goodwill, Defendants were contractually required, following termination, to cease all use of FTF's confidential and trade secret information, and to refrain from having any interest in a competing business within a three-mile radius of their Studio or any other FTF Studio for two years.

Despite this and other contractual prohibitions, FTF learned last week that Defendants have begun competing against FTF in breach of the franchise agreements. And, two days ago, FTF additionally learned that Defendants are using FTF's misappropriated trade secrets to do so. Specifically, Defendants are currently operating a competitive fitness businesses called C+N Performance at the exact same location of their FTF studio. Defendants misappropriated and are

improperly using FTF's trade secrets, including client data, to compete. Defendants have not only solicited FTF's clients to their new business, they also brazenly transferred entire spreadsheets of client data from the FTF system to their personal and new business accounts after termination and without authorization. Leveraging that stolen data, Defendants now operate the <u>same</u> business at the <u>same</u> location offering the <u>same</u> services to the <u>same</u> clients, under a different name.

This case presents a textbook example of irreparable harm that cannot be addressed through monetary damages. Defendants' misconduct is causing the exact harm that FTF seeks to guard against in its franchise agreements by including non-compete restrictions: loss of clients and competitive position, customer confusion, and diminishment of FTF's brand and goodwill. Defendants' conduct also threatens a domino effect through the franchise system, as their violations, if left unchecked, will embolden other franchisees to misuse FTF's trade secrets to compete against it. FTF is, and continues to be, irreparably harmed. FTF thus requests an emergency hearing and/or the immediate issuance of an injunction, enjoining, as set forth in the Proposed Order, Defendants from unlawfully competing with FTF or using FTF's trade secrets.

## STATEMENT OF FACTS

**I.    FTF IS A WORLD-LEADING PERSONAL TRAINING STUDIO FRANCHISE SYSTEM WITH UNIQUE METHODS AND TRADEMARKS**

FTF is the world's largest personal training fitness franchise. Established in 1983, FTF began franchising in 1996, and now has approximately 117 locations nationwide. (Affidavit of Adam Passarelli Aff., attached as **Ex. 3**, ¶¶ 9-10.) FTF is dedicated to changing lives by helping clients set and stick to their fitness and health goals through a customized fitness experience in a private-suite training setting. (*Id.* at ¶ 9.) Over nearly four decades, FTF has developed unique methods to establish, operate, and promote its personal physical fitness training Studios, a nutrition program, and related services. (*Id.* at ¶ 11.)

As part of its national business model, FTF grants to franchisees the right to establish and operate Studios according to FTF standards, specifications, methods, techniques, and operating and other procedures ("System Standards"), which constitute FTF's unique franchise system. (*Id.* at ¶ 12.) FTF likewise grants franchisees access to FTF's confidential, proprietary, and trade secret information, including FTF's client data, during, and for the sole purpose of, the establishment and operation of their Studios under FTF's System Standards. (*Id.* at ¶ 13.)  FTF has invested substantial time, money, and effort in developing its unique System Standards and protecting the secrecy of its confidential, proprietary, and trade secret information. (*Id.* at ¶ 14.) FTF spends significant funds each year on marketing and branding in the highly competitive fitness industry and has established considerable goodwill and valuable customer recognition. (*Id.* at ¶ 16.)

## II.    FTF ENTERS INTO FRANCHISE AGREEMENTS WITH DEFENDANTS

On March 15, 2012, FTF granted Everest Fitness Inc. the right to establish and operate a Studio at 36 Newbury Street, Boston, Massachusetts 02116, pursuant to a franchise agreement. ("Back Bay Agreement," attached **Ex. 4**) Likewise, on March 28, 2017, FTF granted Everest Wellness Inc. the right to establish and operate a Studio at 10 South Main Street, Topsfield, Massachusetts 01983, pursuant to a franchise agreement. ("Topsfield Agreement," attached as **Ex. 5**, referred to jointly with the Back Bay Agreement as the "Agreements.")

Defendants likewise signed Personal Guaranty and Assumptions, whereby Partridge personally guaranteed both Agreements and Cronin personally guaranteed the Topsfield Agreement, thereby agreeing to be personally bound by, and liable for the breach of, each and every provision contained therein. (Ex. 4, p. 53; Ex. 5, p. 59.) As Partridge's spouse, Cronin is also a "Bound Party" under the Back Bay Agreement. (Ex. 4, § 12.1.)

III.    **THE AGREEMENTS REQUIRE DEFENDANTS TO PROTECT AND MAINTAIN THE SECRECY OF FTF'S CONFIDENTIAL, PROPRIETARY, AND TRADE SECRET INFORMATION**

Under the Agreements, Defendants gained access to and use of FTF's confidential, proprietary, and trade secret information, consisting of, among other things, FTF's System Standards; training and operational materials; unique methods, techniques, formats, specifications, procedures, systems, knowledge, and operational experience; and client data and information ("Confidential Information"). (Ex. 4, § 12.5; Ex. 5, § 12.4.)

FTF's confidential client data and information include client contact information; medical and health information such as medications, injuries, illnesses, pre-existing conditions, alcohol and tobacco intake, blood pressure, body composition, dietary restrictions; and the client's personalized fitness and nutrition goals, habits, customized programs, and documented notes from sessions regarding client performance and preferences ("Client Information"). (Ex. 3, Passarelli Aff. ¶ 23; Ex. 4, p. 2 ¶¶ B-C, §§ 10.4(g), 12.5; Ex. 5, §§ 7.5(m), 10.5, 12.4.) The Agreements further provide that FTF has the sole right to, and interest in, all Confidential Information, including Client Information. (Ex. 3, Passarelli Aff. ¶ 25; Ex. 4, § 10.4(g); Ex. 5, § 10.5.)

FTF has invested substantial time and effort to maintain the secrecy of FTF's Confidential Information, including Client Information, by storing such information in highly-confidential, password-protected databases. (Affidavit of Chris Richards ("Richards Aff."), attached as **Ex. 6**, ¶ 7; Ex. 3, Passarelli Aff. ¶ 24.) The Agreements also contain numerous provisions intended to protect such information, including that the Agreements:

- include 25 itemized franchisee obligations solely included to protect FTF's Confidential Information (Ex. 4-5, § 7.6);

- require the implementation of all administrative, physical, and technical safeguards necessary to protect any information that can be used to identify FTF's clients, including names, addresses, telephone numbers, e-mail addresses, . . . financial information, credit card information, biometric or health data . . . ." (Ex. 5, § 7.5(e));

- prohibit Defendants from using FTF's Confidential Information outside the establishment and operation of the Studio or in any other business or capacity (Ex. 4, § 12.5; Ex. 5, § 12.4);

- require the Defendants to maintain the confidentiality of the Confidential Information during and after the Agreements' terms (*id.*);

- prohibit Defendants from making unauthorized copies of any portion of the Confidential Information (*id.*);

- require Defendants to adopt and implement all procedures that FTF proscribes to prevent the unauthorized use or disclosure of Confidential Information (*id.*);

- prohibit during and post-term competition, as detailed below (Exs. 4-5, § 12.1-12.2);

- following termination, obligate Defendants to immediately and permanently cease to use, in any manner whatsoever, any of FTF's Confidential Information and deliver to FTF all Confidential Information and other materials related to the operation of the Studio (Ex. 4, § 10.4, 12.5; Ex. 5, § 10.4, 12.4); and

- following termination, require the return of all manuals, plans, specifications, designs, records, data samples, models, programs, materials, handbooks, drawings, other materials and other Confidential Information (Ex. 4, § 10.4, 12.5; Ex. 5, § 10.4, 12.4).

## IV.    THE FRANCHISE AGREEMENTS PROHIBIT DEFENDANTS FROM COMPETING AGAINST FTF

To further protect against the dissemination and use of FTF's Confidential Information, the Agreements also prohibit Defendants from competing against FTF, during and after termination of the Agreements. As relevant here, the Agreements provide:

- Section 12.2. <u>Post Termination Covenant Not to Compete</u>, prohibits, for a period of two years following the termination of the Agreement, Defendants from having any direct or indirect interest in any Competitive Business located or operating within a three-mile radius of Defendants' Studios or any other FTF Studio.

- "Competitive Business" is defined as any one-on-one or personal small group physical fitness studio or any other physical fitness or nutrition service business, or any business offering or selling products or educational materials, or conducting workshops for, services that are the same as, similar to, or competitive with the Franchise System or other Studios.

(Exs. 4-5, §§ 12.1-12.2.)

## V.      DEFENDANTS VIOLATE THE AGREEMENTS AND FTF TERMINATES THEM

In June 2021, FTF learned that Everest and Defendants, as guarantors of the Agreements, had breached the Agreements in several ways, including by not paying and maintaining insurance coverage, *see* Exs. 4-5, § 7.4, and, under the Topsfield Agreement, failing to pay a series of lease payments to the landlord, *see* Ex. 5, § 7.6(m). (June 9, 2021 "Termination Notices," attached as **Exs. 7-8**.) In light of these violations, FTF terminated the Agreements on June 9, 2021 and so notified Defendants. (*Id.*) The Termination Notices expressly reiterated all post-termination obligations in the Agreements, including provisions governing Confidential Information, requiring Defendants to de-identify, and prohibiting Defendants from competing with FTF. (*Id.*)

Nonetheless, on July 13, 2021, FTF discovered that Defendants had not complied with, and instead breached, several post-termination obligations. Specifically, FTF discovered that Defendants had not de-identified the FTF Studios by removing FTF's trademarks, thereby infringing on FTF's trademark rights and harming FTF's goodwill associated with its brand. (July 20, 2021 Letter from K. Reilly to Everest and Partridge, attached as **Ex. 9**.) Further, Defendants had continued operations at Back Bay, in violation of their non-compete and other obligations under the Agreements and state and federal law. (*Id*.)

On July 20, 2021, FTF demanded the immediate cessation of all such conduct. (*Id.*) Partridge initially denied any ongoing operations at Back Bay until FTF provided photographic evidence, after which FTF believed him to have de-identified and stopped operating. (July 21, 2021 Email Exchange between Reilly and Partridge, attached as **Ex. 10**.)

## VI.     DEFENDANTS USE FTF'S CONFIDENTIAL INFORMATION AND TRADE SECRETS TO COMPETE WITH FTF

Nonetheless, just last week, on September 16, 2021, FTF discovered that Defendants are, once again, in breach of the Agreements. Indeed, FTF learned that Defendants have recently

opened and began operating a Competitive Business at the Back Bay Studio location called C+N Performance ("C+N"). (*See* C+N Website, attached as **Ex. 11**, reflecting C+N as open and offering private fitness and nutrition services at the Back Bay Studio location.)

FTF subsequently discovered that Defendants created a C+N Facebook page on August 18, 2021 (attached as **Ex. 12**) and, on the following day, filed a Certificate of Organization for C+N Performance, LLC. (attached as **Ex. 13**). The Certificate states that Cronin is the representative for the entity; the C+N website reflects that Partridge is C+N's contact. (Exs. 11, 13.)

Like FTF, C+N provides "customized personal training sessions [and] nutrition sessions both in person and online." (Ex. 13.) Its services include customized personal fitness, flexibility, and cardio plans, including 12-session, 24-session, and 36-session packages. (Ex. 11.) C+N also advertises on Facebook as open for "customized in person or virtual personal training," as well as "workouts and nutrition counseling." (Ex. 12.)

In addition to Defendants' unlawful operation of this Competitive Business, FTF just learned, on September 21, 2021, that, after termination, Defendants misappropriated, and have improperly been using, FTF's Client Information without FTF's authorization, including as follows:

    a. Defendants have sent emails to FTF's clients, soliciting them to buy multiple months-worth of fitness and nutrition packages for Defendants' Competitive Business, including the day that Defendants' Franchise Agreements were terminated, after Defendants were aware of the termination (Examples attached as **Exs. 14-16**);

    b. Defendants have continued to service over a dozen FTF clients, using FTF's Client Information (Examples attached as **Ex. 17-20**);

    c. Defendants have repeatedly accessed, for use in their Competitive Business, Client Information from Excel spreadsheets and documents that they created from FTF's password-protected database pre-termination. The Client Information on these spreadsheets and documents includes detailed notes sessions regarding client performance and fitness preferences, clients' customized fitness plans, client names

and contact information, client medical information, and clients' at-home fitness tools and preferences (Examples attached as **Exs. 21-25**);

d. On or around June 30, 2021, Defendants and their employee, Jaime Sousa, impermissibly shared access and editing privileges for over 60 of these spreadsheets and documents containing FTF's Client Information via Google Drive to Defendants' personal email accounts, attempting to cut off FTF's access on the same day (Screenshots of Sousa Access Log, **attached as Ex. 26**);

e. On July 19 2021, Cronin impermissibly shared access and editing privileges for 30 spreadsheets and documents containing Client Information via Google Drive to her C+N email account (Screenshots of Cronin Access Log, **attached as Ex. 27**);

f. On July 21, 2021, after being advised of Defendants contractual breaches on July 20, 2021, *see* Ex. 9, Cronin shared access and editing privileges for an additional 33 documents containing Client Information to her C+N email account (Ex. 27);

g. Defendants have continued to access and use these spreadsheets and documents containing Client Information via Google Drive using their personal and C+N email accounts, including as recent as September 21, 2021, after which FTF discovered the conduct and shut off Defendants' access to most of them[2] (Example Showing Defendants' Continued Access, attached as **Exs. 28-29**.);

h. Defendants have taken and are accessing and using Client Information for approximately 30 of FTF's Clients, as reflected on the spreadsheets and documents, email communications, and client testimonials on C+N's website; and

i. Defendants have negotiated with third parties for a "buy out" of FTF's Client Information (Email discussing "buy out" offers, attached as **Ex. 30**).

(Ex. 6, Richards Aff., ¶¶ 11-23; Ex. 3, Passarelli Aff., ¶ 38.)

Further, Defendants have been misrepresenting that C+N is affiliated with FTF, including by operating out of the same Studio location; using the Studio phone number; servicing the same clients; and stating publicly that C+N (as opposed to FTF) has "spent more than 10 years helping keep Boston fit and healthy through workouts and nutrition counseling." (Exs. 11-12.) Likewise, Cronin's personal Facebook and LinkedIn pages market that she is presently a Fitness Coach with

---

[2] Because Defendants transferred and/or copied some Client Information onto Google Documents "owned" by Defendants' employee Jaime Sousa's personal Gmail Account, FTF is unable to cut off Defendants' access to all of them.

FTF. (Cronin FB & LinkedIn, attached as **Exs. 31-32**.) Given her simultaneous affiliation with C+N, such marketing suggests there is a relationship between FTF and C+N, when there is not.

## VII.    DEFENDANTS' CONDUCT IS IRREPARABLY HARMING FTF

The Agreements make clear that FTF's Confidential Information has "valuable goodwill attached to [it]," that its "protection and maintenance are essential to [FTF]," and that their "unauthorized use or disclosure . . . will result in irreparable harm to FTF." (Ex. 4, § 12.5; Ex. 5, § 12.4.) The Topsfield Agreement further requires Defendants to agree and acknowledge that any violation of the restrictive covenants in Section 12, including the noncompetition covenant, "will result in irreparable harm to [FTF]." (Ex. 5, § 12.5.) The Agreements therefore allow for "injunctive relief . . . to prevent that irreparable harm." (Ex. 4, § 15.10; Ex. 5, § 14.8.)

FTF's brand was built based on the business goodwill it has developed over four decades through its customized fitness and nutrition regime. (Ex. 3, Passarelli Aff. ¶ 45.) By unlawfully competing against FTF and stealing its trade secrets, Defendants are not only diluting the secrecy and value of FTF's trade secrets, but also depriving FTF of business opportunities, revenue streams, customers, and business goodwill—none of which can estimated or projected with certainty. (*Id.* at ¶ 46.) Defendants are further giving consumers the false and confusing impression that C+N is either endorsed by or affiliated with FTF, when it is not. (*Id.* at ¶ 51.) Unless Defendants are enjoined from their improper conduct—from competing against FTF and using FTF's trade secrets—FTF will suffer increasing and unquantifiable harm. (*Id.* at ¶ 53.)

## LEGAL STANDARD

The purpose of emergency injunctive relief is to preserve the status quo and the relative positions of the parties until a trial on the merits can be held. *See Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1258–59 (10th Cir. 2005). Under Rule 65, the Court may grant injunctive relief where the movant demonstrates the following factors: (1) a likelihood of success on the merits; (2) a

likelihood that the movant will suffer irreparable harm in the absence of relief; (3) the balance of equities tips in the movant's favor; and (4) the injunction is in the public interest. *DoubleClick Inc. v. Paikin*, 402 F. Supp. 2d 1251, 1255 (D. Colo. 2005); *People's Tr. Fed. Credit Union v. Nat'l Credit Union Admin. Bd.*, 350 F. Supp. 3d 1129, 1138 (D.N.M. 2018) (TRO and PI requirements are the same); 13 James W. Moore et al., Moore's Federal Practice ¶ 65.36(1), at 65-83 (3d ed. 2004); Fed. R. Civ. P. 65. These factors are all satisfied here.

## ARGUMENT

### I.    INJUNCTIVE RELIEF WILL PRESERVE THE STATUS QUO

The status quo means the "last peaceable position" existing between the parties before the dispute developed. *Dry Cleaning To-Your-Door, Inc. v. Waltham Ltd. Liab*. Co., No. 07-cv-01483-WDM-MJW, 2007 WL 4557832, at *2 (D. Colo. Dec. 20, 2007). Here, the last peaceable position was the world as it existed before Defendants began unlawfully competing with FTF and using its Client Information. An injunction barring this conduct will preserve that status quo and immediately prevent the harm already done to FTF from compounding. *See id* (last peaceable status was when defendant was "bound by the non-compete provision[;] . . . an injunction prohibiting competition would [maintain] the status quo"); *DoubleClick Inc*., 402 F. Supp. 2d at 1256 (Murphy, J. concurring) (same); *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 1013 (10th Cir. 2004) (McConnell, J., concurring) (requiring a party who disturbed the status quo to reverse its actions, "restores, rather than disturbs, the status quo.").

### II.    FTF IS LIKELY TO SUCCEED ON THE MERITS

FTF has asserted claims for breach of contract and trade secret misappropriation and is likely to succeed on each. To demonstrate a likelihood of success on the merits, a plaintiff must "present 'a prima facie case showing a reasonable probability that [it] will ultimately be entitled to the relief sought.'" *Salt Lake Tribune Pub. Co., LLC v. AT & T Corp.*, 320 F.3d 1081, 1100 (10th

Cir. 2003); *Continental Oil Co. v. Frontier Ref. Co*., 338 F.2d 780, 781 (10th Cir. 1964). This burden is lower than showing an "overwhelming" likelihood of success, or "positively" establishing a right to relief on the merits. *Atchison, Topeka and Santa Fe Ry. Co. v. Lennen*, 640 F.2d 255, 261 (10th Cir. 1981). And where the three "harm" factors tip "decidedly" in the moving party's favor, the "probability of success requirement" is relaxed further; the moving party "need only show questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation." *Heidemann v. S. Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003). FTF satisfies this burden.[3]

A.    **FTF Has a Likelihood of Success on its Breach of Contract Claim**

For breach of contract, FTF must show (1) a binding and valid contract; (2) that FTF substantially performed; (3) that Defendants failed to perform; and (4) resulting damage. *Western Distrib. Co. v. Diodosio*, 841 P.2d 1053, 1058 (Colo. 1992).[4] FTF will so establish.

First, the Agreements executed between Everest and FTF, are valid and enforceable, and FTF has performed its obligations thereunder. (Exs. 4-5.) Further, Partridge is a guarantor of both Agreements, and thereby bound by each and every obligation contained therein. (*Id*.) Cronin is likewise so bound as a guarantor of the Topsfield agreement, and she is further obligated to the provisions at issue here, as a Bound Party under both Agreements. (Ex. 5, p. 59; Ex. 4, § 12.1.)

Although Colorado public policy generally disfavors covenants not to compete, the statutory prohibition does not apply to (1) executive management personnel or (2) contracts for the protection of trade secrets. Colo. Rev. Stat. § 8-2-113(2)(b),(d). Both statutory exceptions apply here. First, Partridge served as the sole owner of the franchisee in the Back Bay Agreement, and

---

[3] Even if the "relaxed" standard did not apply, FTF still meets the traditional standard.

[4] Colorado law applies pursuant to § 14.1 of the Agreements.

Defendants served as co-owners of the franchisee in the Topsfield Agreement. (Ex. 4, p. 52; Ex. 5, p. 58.) Second, the non-compete provisions, among numerous other provisions in the Agreements, are designed to protect FTF's trade secrets. (Ex. 4-5, §§ 12.1-12.2.) The Agreements expressly recognize the highly confidential, proprietary, and valuable nature of FTF's trade secrets, including all Confidential and Client Information, shared in connection with the franchise relationship, and thus contain robust restrictions designed to safeguard that information and prohibit its disclosure. (Ex. 4, §§ 7.6, 10.4, 12.1-12.2, 12.5; Ex. 5, §§ 7.6, 10.4, 12.1-12.2, 12.4.) The Agreements protect FTF's trade secrets from dissemination by, among other things, keeping them in password-protected databases, limiting access, requiring franchisees to return such information upon termination, and prohibiting franchisees from competing with FTF. (*Id.*) Read together, the Agreements' provisions demonstrate and protect against FTF's substantial concern that a franchisee with access to FTF's trade secrets could otherwise use that information to harm FTF's business after departing. (*Id.*) As a result, the provisions are valid and enforceable. *See Fitness Together Franchise, L.L.C. v. EM Fitness, L.L.C.*, No. 1:20-cv-02757-DDD-STV, 2020 WL 6119470, at *9 (D. Colo. Oct. 16, 2020) (FTF's non-compete provisions were enforceable because the defendant was the franchisees' owner and the franchise agreements were intended to protect trade secrets.); *Core Progression Franchise LLC v. O'Hare*, No. 21-cv-0643-WJM-NYW, 2021 WL 1222768, at *7 (D. Colo. Apr. 1, 2021) (finding the same two exceptions to apply to Core Progression Franchise's franchise agreements).

Non-competition provisions must also be reasonable in duration and geographic scope to be enforceable. *Reed Mill & Lumber Co. v. Jensen*, 165 P.3d 733, 736 (Colo. App. 2006). Covenants not to compete for up to five years, and with nationwide restrictions, have been held reasonable in Colorado. *Core Progression Franchise LLC*, 2021 WL 1222768, at *7 (25-mile

radius for one year); *Fitness Together Franchise, L.L.C.*, 2020 WL 6119470, at *9 (three-mile radius for one year); *Harrison v. Albright*, 577 P.2d 302, 305 (Colo. App. 1977) (100-mile radius and five years). Here, the two-year, three-mile-radius non-competition restriction easily meets this standard.

Second, the Defendants' conduct in using FTF's Client Information to compete against FTF with a Competitive Business, violates multiple provisions of the Agreements, including:

- Section 12.2, prohibiting Defendants from competing against FTF within a three-mile radius of the Studio or any other FTF Studio existing on the termination date for two years;

- Section 12.5, prohibiting Defendants from copying, using, or disclosing without authorization FTF's propriety, confidential, and trade secret information, including its Client Information, in any other business and capacity; and

- Section 10.4, proscribing numerous post-termination obligations, including that Defendants cease "doing anything" that would indicate an affiliation with FTF post-termination and abide by all restrictive covenants, including as related to competition and Confidential Information.

Third, as further explained below, by continuing to violate these and other provisions in the Agreements, Defendants have caused, and will continue to cause, severe unquantifiable harm, including by sabotaging FTF's client relationships, diverting customers and business away from FTF, damaging its business goodwill, and creating domino effect throughout the franchise system.

## B.    FTF's Trade Secret Misappropriation Claims Are Also Likely to Succeed

Under the Colorado Uniform Trade Secret Act ("CUTSA") and federal Defend Trade Secrets Act ("DTSA"), trade secret misappropriation occurs when a person discloses or uses another's trade secrets obtained by improper means, including through breach of a duty to maintain their secrecy. 18 U.S.C. § 1839(5)-(6); C.R.S. § 7-74-102(1)-(2); *see also Mineral Deposits Ltd. v. Zigan*, 773 P.2d 606, 608 (Colo. App. 1988). It is well established under Colorado and federal law that confidential and proprietary client lists and data can constitute trade secrets.

*See Hertz v. Luzenac Grp*., 576 F.3d 1103, 1114 (10th Cir. 2009) (customer lists can be trade secrets under CUFTA); *MSC Safety Sols., LLC v. Trivent Safety Consulting, LLC*, No. 19-cv-00938-MEH, 2019 WL 5189004, at *7 (D. Colo. Oct. 15, 2019) (same under DTSA). This is particularly true where, like here, client lists contain substantial non-public information such as individualized customer preferences and data that have particularized value stemming from FTF's unique services. *See Fitness Together Franchise L.L.C.*, 2020 WL 6119470, at *11 (finding FTF's client lists constitute trade secrets under Colorado and federal law); *see also* C.R.S. § 7–74–102(4); 18 U.S.C. § 1839(3)(B); *Mentor Worldwide LLC v. Craigo*, No. 12-cv-00776-REB-MJW, 2012 WL 1439498, at *3 (D. Colo. Apr. 26, 2012) ("highly relevant information about . . . customers, such as sales histories . . . and customer preferences, likely are [] trade secrets").

FTF has undergone substantial efforts to protect its Client Information. This highly confidential information includes FTF's clients' personal information, medical information, trainer notes, fitness and nutrition preferences, habits, workouts, and goals, and other customized data particular to FTF's services and programs that are not publicly available. (Ex. 3, Passarelli Aff. ¶¶ 23-24.) As set forth above, to protect such data, FTF only allows franchisees access during the course of their operation of Studios, requires them to return all Client Information immediately upon the termination of their Studio, stores all such information in highly-confidential, password-protected databases, and strictly enforces numerous other protective contractual provisions. (Ex. 4, §§ 7.6, 10.4, 12.1-12.2, 12.5; Ex. 5, §§ 7.6, 10.4, 12.1-12.2, 12.4.) Indeed, the dissemination of FTF's Client Information to its competitors has caused and will continue to cause substantial and irreparable harm to FTF given the highly competitive nature of the fitness industry. (Ex. 3, Passarelli Aff. ¶¶ 45, 53.) *See Blue Star Land Servs., LLC v. Coleman*, No. CIV-17-931-R, 2017

WL 6210901, at *5-6 (W.D. Okla. Dec. 8, 2017) (finding the trade secret had independent economic value where defendant allegedly functioned "in a highly competitive market").

Despite FTF's protection efforts, Defendants improperly took and are using FTF's trade secrets, including FTF's client lists and data. (Ex. 3, Pasarelli Aff. ¶ 38.) As detailed in Part VI above, Defendants obtained this data by breaching their contractual obligations and did so to unlawfully compete with FTF. This powerful evidence establishes FTF is likely to prevail in establishing that Defendants have misappropriated FTF's trade secrets in violation of state and federal law. *See Fitness Together Franchise L.L.C.*, 2020 WL 6119470, at *10 (finding that FTF had a likelihood of success on its trade secret claims under like circumstances).

## III.  FTF WILL SUFFER IMMEDIATE AND IRREPARABLE HARM ABSENT INJUNCTIVE RELIEF

Courts regularly find irreparable harm where there is an "inability to calculate damages, harm to goodwill, diminishment of competitive positions in marketplace, . . . and lost opportunities." *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1263 (10th Cir. 2004). These circumstances exist here. *See Fitness Together Franchise L.L.C.*, 2020 WL 6119470, at *11 (finding irreparable harm and granting injunctive relief to FTF under like circumstances).

To begin, the Agreements make clear that FTF's Confidential Information has "valuable goodwill attached to [it]," that its "protection and maintenance are essential to [FTF]," and that their "unauthorized use or disclosure . . . will result in irreparable harm to FTF." (Ex. 4, § 12.5; Ex. 5, § 12.4.) The Topsfield Agreement further states that any violation of the restrictive covenants, including the noncompetition covenant, "will result in irreparable harm to [FTF]." (Ex. 5, § 12.5.) The Agreements therefore allow for "injunctive relief . . . to prevent irreparable harm." (Ex. 4, § 15.10; Ex. 5, § 14.8.)

Further, FTF's irreparable harm is real, imminent, and not compensable through liquidated damages. FTF's brand was built and continues to thrive in a highly competitive industry based on the business goodwill it has developed over four decades through personal contacts and dedication to the unique preferences and service-needs of its clients. (Ex. 3, Passarelli Aff. ¶ 45.) FTF's focus on customized client service is not only the reason that FTF limits the access to and use of its Confidential Information, but also why any damages stemming from loss of that goodwill would be nearly impossible to quantify. *See Equifax Servs., Inc. v. Hitz*, 905 F.2d 1355, 1361 (10th Cir. 1990) (irreparable harm because plaintiff's "business is based on personal contacts and a knowledge of the special needs and requirements of customers . . . a fact which complicates any damage estimate").

For these reasons, courts in this District routinely find irreparable harm in cases, like this one, where "territorial integrity and covenants not to compete are essential to maintaining [an] established franchise network" such that harm to such established goodwill is "not readily remedied by damages." *Dry Cleaning*, 2007 WL 4557832, at *3; *Equifax Servs., Inc.*, 905 F.2d at 1361 (citing cases); Restatement (Second) of Contracts § 360(b) (Am. Law Inst. 1981) ("The breach of a covenant not to compete may cause the loss of customers of an unascertainable number or importance."). Indeed, the difficulty of proving damages in non-competition clause cases has made injunctive relief the preferred remedy in Colorado. *Dry Cleaning*, 2007 WL 4557832, at *3; *DoubleClick Inc.*, 402 F. Supp. at 1260.

Finally, by unlawfully competing with FTF using its trade secrets, Defendants have caused, and will continue to cause, unquantifiable harm to FTF, including as follows:

17

- **Defendants are confusing clients into believing C+N is associated with FTF.** Defendants are using the <u>same</u> Studio location and phone number to provide the <u>same</u> services as FTF to the <u>same</u> clients. Defendants are also touting of FTF's prior decade of fitness and nutrition experience as C+N's and Cronin publicly presents herself as both an FTF Fitness Coach and C+N's executive manager. (Exs. 12, 31-32.) Customer confusion causes substantial harm to FTF's brand and erodes its goodwill in the marketplace. (Ex. 11, showing client testimonial stating that she has been with C+N for 4 months, thereby confusing it with Defendants' prior FTF Studio.) *See Fitness Together Franchise L.L.C.*, No. 2020 WL 6119470, at *11 (D. Colo. Oct. 16, 2020); *Core Progression Franchise LLC,* 2021 WL 1222768, at *9.

- **Defendants' conduct is causing FTF to lose clients.** Defendants' operation of C+N at their Studio location is causing injury to FTF in the form of lost clients who would otherwise patronize an FTF location—20 of which are within a 25-mile radius of C+N. *See Am. Television and Commc'ns Corp. v. Manning*, 651 P.2d 440, 445-46 (Colo. App. 1982) (difficulty in measuring monetary value of lost customers renders damages inadequate).

- **Defendants are harming FTF's business interests by using the benefits and trade secrets they obtained from the FTF franchise to compete against it.** Defendants have substantially benefitted from FTF's Confidential Information, including its Client Information. Their use of that information dilutes the uniqueness of FTF's services and harms its business interests. *See Husky Ventures, Inc. v. B55 Invs., Ltd*., 911 F.3d 1000, 1011-14 (10th Cir. 2018) (citing cases for proposition that "[d]amages flowing from . . . injury to . . . business interests are especially difficult to calculate"); *see also Rent–A– Center, Inc. v. Canyon Television & Appliance Rental, Inc.,* 944 F.2d 597, 603 (9th Cir. 1991) (irreparable harm from violation of non-compete where intangibles like advertising efforts and goodwill were injured).[5]

- **Defendants' conduct threatens a domino effect of irreparable harm to the entire FTF franchise model.** Emboldened by Defendants' example, other franchisees may take the benefits of FTF's front-end investment, brand, goodwill, and trade secret information, abandon the franchise system, and compete against FTF. *See Postnet Int'l Franchise Corp*, 2021 WL 1037914, at *13 (plaintiff's franchise model could be undermined if other franchisees thought they could disregard non-competes based on the defendant's conduct).[6]

(Ex. 3, Passarelli Aff't, ¶¶ 43-53.) These serious harms cannot be remedied by monetary damages;

an injunction is needed to prevent further irreparable harm to FTF.

---

[5] *See also Postnet Int'l Franchise Corp. v. Wu*, 1:20-cv-03790-DDD-SKC, 2021 WL 1037914, at *13 (D. Colo. Feb. 19, 2021) (injunction might be warranted with "evidence that [defendant] is using any particular aspect of [plaintiff's] 'system' that is distinguishable from common business practices".)

[6] *See also Reconstruction Experts Inc. v. Franks*, No. 2018CV30509, 2018 WL 1973177, at *7 (D. Colo. Feb. 23, 2018) ("[n]umerous [Colorado] cases have recognized that an employer will suffer real, immediate and irreparable harm if its former employees are allowed to unlawfully misappropriate confidential and proprietary information in a competing business.").

IV.    **THE HARM TO FTF FAR OUTWEIGHS THE HARM TO DEFENDANTS CAUSED BY THEIR MISCONDUCT**

The balance of harms favors injunctive relief. Injunctive relief will simply preserve the status quo as it was before Defendants began misappropriating FTF's trade secrets and otherwise flagrantly violating their contractual obligation. Any harm to Defendants—including the closure of C+N—should be disregarded, given that this conduct is impermissible and the Defendants "brought [the] injury upon [themselves]." *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co*., 290 F.3d 578, 596 (3d Cir. 2002*); see also Bad Ass Coffee Co. of Hawaii, Inc. v. JH Nterprises, L.L.C.*, 636 F. Supp. 2d 1237, 1251 (D. Haw. 2009) ("Courts balancing harms to former franchisees who violated non-compete agreements have similarly been unwilling to allow defendants to point to harms that they could have avoided by abiding by their contract."). On the other hand, FTF suffers considerable harm each day Defendants are allowed to flout the non-compete provisions in the Agreements and use FTF's trade secrets.

V.    **AN INJUNCTION SERVES THE PUBLIC INTEREST**

The injunctive relief sought by FTF serves the public interest in multiple ways. First, the public interest is served by enforcing valid contracts and by using injunctive relief to enforce lawful behavior. *E.g., Dry Cleaning*, 2007 WL 4557832, at *3; *Quidel Corp. v. Superior Ct. of San Diego Cty*., 271 Cal. Rptr. 3d 237, 247 (Cal. Ct. App. 2020) (non-compete designed to protect the parties and their dealings does not negatively affect the public interests). Here, Defendants should be held to their contracts and the law.

Second, public policy likewise supports protecting valid trade secrets from unlawful misappropriation and use—particularly, like those here, which involve proprietary and confidential client data and the unauthorized use and disclosure of which is, and continues to be, detrimental to FTF, its relationship with its clients, and its business competitiveness. *See*

*Fireworks Spectacular, Inc. v. Premier Pyrotechnics, Inc.*, 86 F. Supp. 2d 1102, 1107 (D. Kan. 2000). The public interest will be served by enjoining Defendants' misuse of FTF's trade secrets.

## VI.    FTF SHOULD NOT BE REQUIRED TO POST SECURITY

Rule 65(c) references "security in an amount that the [C]ourt considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." The Court may, in exercise of discretion, however, determine a bond is unnecessary to secure an injunction "if there is an absence of proof showing a likelihood of harm." *Coquina Oil Corp. v. Transwestern Pipeline Co*., 825 F.2d 1461, 1462 (10th Cir. 1987).

Here, for the reasons discussed, Defendants will not suffer any undue harm if the requested relief is granted. Instead, injunctive relief will preserve the status quo by restoring the parties to the "last peaceable position" existing between them before the dispute developed. *Dry Cleaning*, 2007 WL 4557832, at *2. The last peaceable position was the world as it existed before Defendants began unlawfully violating their Agreements and misappropriating and using FTF's trade secrets. An injunction barring this conduct will not affect the Defendants' future—or present and lawful—business prospects and interests. Accordingly, no bond should be required.

## <u>CONCLUSION</u>

For the foregoing reasons, FTF respectfully requests that the Court grant FTF's Motion and set this matter for an emergency hearing and/or immediately enjoin Defendants, and any other Bound Party, as defined in the Agreements, from:

    a.  having any direct or indirect interest as a disclosed or beneficial owner, investor, partner, director, officer, employee, consultant, representative, agent, or in any other capacity in any Competitive Business, including C+N Performance, located or operating within a three-mile radius of their Topsfield or Back Bay Studio location or within a three-mile radius of any other FTF Studio; and

    b.  copying, disclosing, accessing, or using in any other manner whatsoever FTF's proprietary, confidential, and trade secret information, including but not limited to FTF's Confidential Information, including its Client Information.

Dated:  September 23, 2021.              Respectfully submitted,


                                        *s/ Kathryn A. Reilly*
                                        Kathryn A. Reilly
                                        Melissa L. Romero
                                        Wheeler Trigg O'Donnell LLP
                                        370 Seventeenth Street, Suite 4500
                                        Denver, CO 80202
                                        Telephone:   303.244.1800
                                        Facsimile:    303.244.1879
                                        Email:   reilly@wtotrial.com
                                                 romero@wtotrial.com

                                        Attorneys for Plaintiff,
                                        Fitness Together Franchise, LLC

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on September 23, 2021, I electronically filed the foregoing **PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** with the Clerk of Court using the CM/ECF system. Notification of such filing will be sent to the following via email and overnight delivery:

Nathan Partridge
nate_partridge@yahoo.com
nate@cnperformance.net

Courtney Cronin
courtney.cronin.cc@gmail.com

                                        *s/ Claudia Jones*